IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| PATRICK J. CAMERON, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Civil Action No. 14-0663 |
| | ) | Judge Maurice B. Cohill, Jr. |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

### *I. Introduction*

Pending before this Court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the claims of Patrick Joseph Cameron ("Plaintiff" or "Claimant") for Disability Insurance Benefits ("DIB") under Title II and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381 et. seq. (2012). Plaintiff argues that the decision of the Administrative Law Judge ("ALJ") should be reversed or remanded because the ALJ improperly disregarded the medical opinion of Plaintiff's treating physician, Dr. Ashfaq, improperly determined Plaintiff's residual functional capacity ("RFC"), improperly disregarded the testimony of the Vocational Expert ("VE"), and erred as a matter of law in finding that Plaintiff's substance use disorder was a contributing factor to his disability. For these reasons Plaintiff asserts that the ALJ's decision to deny benefits was not supported by substantial evidence as required by 42 U.S. C. §405(g) [See generally ECF No. 12].

1

To the contrary, Defendant argues that the ALJ properly assigned Dr. Ashfaq's opinion the appropriate weight, properly reviewed all of the evidence to make a reasoned RFC determination by relying on the record and testimony of the VE. Furthermore, Defendant asserts that Plaintiff over-exaggerated his limitations, which were unsupported by the record. Therefore, Defendant argues that the ALJ's decision should be affirmed. The parties have filed cross motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

For the reasons stated below, the Court will deny Plaintiff's Motion for Summary Judgment [ECF No. 8]. In turn, the Court will grant Defendant's Motion for Summary Judgment [ECF No. 11].

## *II. Procedural History*

On December 1, 2009, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits (R. at 26). On the same date, the claimant also protectively filed a Title XVI application for the supplemental security income (R. at 26). In both applications, the claimant alleged disability beginning January 1, 2005 (R. at 26). The claims were denied initially on August 26, 2010, and upon reconsideration on April 20, 2011 (R. at 26). The claimant filed a timely written request for a hearing on June 15, 2011, and a hearing was held before an ALJ on April 10, 2012 and on August 17, 2012 (R. at 26, 186-199, 105-132, 48-93). At the hearing on April 10, Plaintiff amended his alleged onset date of disability to November 13, 2009 (R. at 54). VE, Louis Szollosy, also was present at this hearing (R. at 26). VE, William Slaven, was present at the hearing on August 17, 2012 (R. at 87). The claimant was represented by attorney Ryann M. Buckman at both hearings (R. at 26).

On September 28, 2012, ALJ Frederick Timm determined that Plaintiff did not qualify for disability benefits under Section 1614(a)(3)(A) of the Social Security Act because Plaintiff's substance abuse was a material factor to his disability determination (R. at 42). The ALJ stated,

> The vocational expert testified that the claimant had past relevant work as a labor building maintenance person (DOT code 381.687-014), which he described as "heavy and unskilled and performed at medium as the claimant performed it. In comparing the residual functional capacity the claimant would have if he stopped the substance use with the physical and mental demands of this work, the undersigned finds that the claimant would be able to perform it as generally performed. (R. at 42).

On November 27, 2012, Plaintiff submitted a timely written request for review by the Appeals Council (R. at 21-22). On April 1, 2014, the Appeals Council denied Plaintiff's request for review thus making the Commissioner's decision final under 42 U.S.C. §405(g) (R. at 1-4).

### *III. Medical History*

There are numerous health notes from various mental health institutions and physicians on the record. Most address Plaintiff's alcohol and substance abuse. Only a few address Plaintiff's personality disorder diagnosis and even fewer discuss the medical issue relevant to this case – whether Plaintiff is disabled without the added impairments from his substance abuse disorders.

On December 19, 2006, Plaintiff was admitted to the Richard C. Ward Addiction Treatment Center (ATC) for alcohol and cocaine addiction treatment. He was noted to have a history of depression and to have stopped his medication on his own about a month prior. He reported feeling okay and denied any suicidal ideation, but he wished to see a psychiatrist. The notes on substance abuse indicate that he primarily uses alcohol but also uses cocaine and marijuana (R. at 317). He uses alcohol daily and his longest period of sobriety was two years

ago for 10 months (R. at 318). During his physical it was recorded that his last drink was three days ago. He tested positive for marijuana and positive for cocaine (R. at 318).

On January 3, 2007, Plaintiff was discharged from the Richard C. Ward ATC to Blaisdell ATC in Orangeburg, NY. He was considered stable and was to follow up with his primary medical doctor. He was prescribed and given Welbutrin upon discharge (R. at 321). However, it was noted that "he received his treatment plan but was unable to complete his goals due to his early discharge." (R. at 330). He was transferred to Blaisdell ATC after only two weeks of the program because he tested positive for smoking cigarettes. The diagnosis did not mention a personality disorder.

Plaintiff was admitted to Fairmount Behavioral Health in Philadelphia, Pennsylvania on November 14, 2008 due to suicidal ideation and substance abuse. He reported his last use of cocaine was on November 12, 2008. Plaintiff has attended rehab three times. The last time he attended rehabilitation was in 2006. In that same year he reported having two psychiatric hospitalizations. He said he currently attends AA and NA. He was described as well-developed and well-nourished in no acute distress with fair hygiene and some psychomotor retardation. His urine drug screen was negative. Plaintiff was discharged on November 19, 2008 (R. at 333).

Plaintiff's intake records show that he uses cocaine 2-3 grams per day, 1-2 times per week, 15-20 12oz cans of beer daily and 1 quart of whiskey daily. It also notes that Plaintiff reported being clean from October 13, 2007 to October 13, 2008. He reported attending AA daily (R. at 359). Plaintiff reported working up until 2 weeks prior as a landscaper for 9 months when he became too depressed to get up for work (R. at 369).

Additionally, Plaintiff reported noncompliance with medications and admitted to using alcohol and cocaine. While he reported suicidal ideations, he consistently denied auditory or

4

visual hallucinations throughout the documented treatment. On November 19, 2008, Plaintiff was assessed with a Global Assessment of Functioning ("GAF") of 40,[1] prescribed Wellbutrin, and discharged. There was no mention of a personality disorder. Plaintiff was to follow up on his next scheduled appointment, November 20, 2008 (R. at 335).

On October 24, 2009, Plaintiff was admitted to AtlantiCare. He was discharged on October 29, 2009. Plaintiff was admitted due to suicidal ideation and stated that he had started drinking again 2 months ago. His blood alcohol level was .132 and his urine drug screen was negative (R. at 375). The Discharge Summary History states that, for the first documented time Plaintiff reported having visual and auditory hallucinations (R. at 374). Plaintiff also reported a history of anxiety attacks (R. at 374).

During treatment, Plaintiff was medication and group compliant and he improved. Plaintiff remained ambivalent about suicidal ideation and did not have a plan. He went to groups but remained isolated. Plaintiff was stable enough for home discharge on December 28, 2009 and was described as goal directed with no auditory or visual hallucination, delusions, paranoia, or suicidal ideations (R. at 376).

At his therapy appointment on January 6, 2010, Plaintiff reported attending Mentally Ill Chemical Abusers ("MICA") group every Tuesday, attending AA five times a week, admitted his previous suicide attempts, and that he had no present suicidal thoughts (R. at 467). Furthermore, Plaintiff stated that "he experienced suicidal thoughts and attempts when he was off medication." (R. at 467).

---

[1] The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and is used by a clinician to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R). The greater the number the higher the functioning of the individual.

5

On January 20, 2010, Plaintiff reported that he was sober for 90 days and continues to go to AA meetings five days a week. He stated that he loses his motivation to stay sober around 8-12 months and then relapses because he begins to believe that he does not have a problem with his drinking anymore (R. at 469).

On February 9, 2010, Plaintiff stated during therapy that he was four months sober and reported attending AA weekly (R. at 471).

During his March 1, 2010 therapy session Plaintiff reported fleeting suicidal ideation but that he was still in AA. He mentioned that he was thinking of changing meetings, joining a gym and starting baseball. Plaintiff was to continue to take his medication and abstain (R. at 473).

During his session on March 11, 2010, Plaintiff mentioned hearing voices telling him to kill himself but that "he would never do it." (R. at 475). No substance abuse was recorded.

On March 12, 2010, during therapy Plaintiff reported an anxiety attack and suicidal ideation. He stated that he was attending AA 6-7 days per week and abstaining. Plaintiff mentioned that he joined a gym and was working out 3 days a week (R. at 475). Plaintiff stated that he was able to control his anxiety attack and suicidal ideation using his learned coping mechanisms.

During his session on March 15, 2010, Plaintiff discussed his interview for a part time job. He thought that it would help him feel better about himself. He reported his mood as good though reported feeling depressed a few days prior. Plaintiff said that he wanted to continue with therapy and going to AA meetings about 7-10 times per week, that he had been taking his medication as directed, and that he continued to abstain from alcohol use (R. at 476).

Plaintiff was hospitalized from March 20, 2010 to March 23, 2010 and had no idea how he made it to the hospital. Due to his hospitalization Plaintiff was a no show on March 22, 2010

for his therapy appointment (R. at 477). At his session on March 26, 2010, Plaintiff reported having a drink of alcohol the week before but denied cocaine use. He reported he was still taking medication (R. at 478). Plaintiff also stated that he was fired from his job because his dad's car was in the shop and he was unable to get to work. After getting fired, Plaintiff stated that he went to the casino and drank stating, "I wanted to drink myself to death because I couldn't deal with loosing that job." (R. at 479).

At his appointment on May 21, 2010, Plaintiff stated that he was taking his medication, abstaining from substance use, in a better mood, and no longer thinking about killing himself (R. at 493).

On June 7, 2010, Plaintiff was admitted to Ancora Psychiatric Hospital for a suicide attempt by overdose on Seroquel and Effexor and substance abuse (R. at 388). He reported feeling depressed for at least 2 weeks with suicidal ideation and reported his recent stressor included relapse on alcohol and cocaine after being sober for 2 years (though this appears to be untrue based on the record), financial difficulties, and unemployment (R. at 388). He reported no hallucinations or past history of hallucinations on his Initial Interdisciplinary Needs Assessment and was assessed with a GAF of 40 on June 7, 2010 (R. at 411-413). The treating psychiatrist noted that substance abuse might be a contributing factor to the presentation of his disorders (R. at 416). Because Plaintiff did not attend any scheduled days of his program for several weeks, Plaintiff was discharged on June 16, 2010 (R. at 494-5).

On July 27, 2010, Plaintiff was evaluated by Dr. P. Lawrence Seifer for the New Jersey Clinical Psychological Disability Evaluation (R. at 417). Plaintiff reported suicidal ideation and depression. He stated that he was previously hospitalized for psychiatric issues, was discharged from Ancora the day before, and would be starting at a half way house the next day (R. at 418).

Plaintiff reported being sober for two months (R. at 417). He also reported hearing voices telling him to kill himself (R. at 418). Plaintiff was assessed as having Bipolar Disorder, Panic Disorder with Agoraphobia, Alcohol and Polysubstance Abuse, and a GAF of 55. He was also assessed as having enduring moderate mental limitations due to his mental status (R. at 419).

Dr. Ashfaq evaluated Plaintiff on April 6, 2010 and determined Plaintiff to have a primary diagnosis of Bipolar Disorder, most recent episode depressed. Dr. Ashfaq concluded Plaintiff was unable to work full time but was able to work part-time (R. at 427). Subsequently, on August 17, 2010, Dr. Ashfaq reported Plaintiff to have a primary diagnosis of Bipolar disorder with depressive episodes (R. at 423) and he found Plaintiff unable to work full-time or part-time and determined him to be disabled for 12 months or more from August 17, 2010 to August 16, 2011 (R. at 424).

Dr. Benito Tan evaluated Plaintiff on August 26, 2010 and diagnosed Plaintiff with Affective Disorder, Personality Disorder, and Substance Addiction Disorder (R. at 428). Specifically Dr. Tan said Plaintiff had a "possible personality disorder with borderline features, [a]lcohol [d]ependence, [c]annabis and [c]ocaine [d]ependence." (R. at 436). Dr. Tan did not believe that Dr. Ashfaq's diagnosis of Bipolar Disorder and Panic Disorder was supported by evidence. To support this conclusion, Dr. Tan noted that Plaintiff had a 10 month period of sobriety with no evidence of deterioration or admissions to rehabilitation (R. at 444).

Plaintiff was institutionalized on May 1, 2011 for acute alcohol intoxication at AtlantiCare (R. at 560).

On August 10, 2011, Plaintiff returned to AtlantiCare. He reported mood fluctuations from happy to sad but denied suicidal ideation. He reported auditory hallucinations every couple of days and drinking alcohol daily. Plaintiff stated that his last drink was July 28, 2011, that he

8

was going to meetings to help stay sober. He said he did not think his alcohol contributed to his mental health issues. He reported not being on his medication (R. at 520).

Plaintiff was scheduled for injections because he was noncompliant with his medication. Plaintiff's case was closed on November 15, 2011 due to missed appointments and withdrawal from the program (R. at 509, 516-519, 536).

Plaintiff's entire medical history shows periods of decompensation and substance abuse. Plaintiff's therapists consistently noted that he was generally kempt in appearance and able to hold appropriate conversations.

### *IV. Summary of Testimony*

Plaintiff only completed 11th grade when he dropped out because he wanted to drink all day (R. at 68). During school he was in special education courses (R. at 68). Plaintiff indicated that he spends his day doing nothing because he gets too paranoid and gets panic attacks when going out around large crowds (R. at 79). He indicated that nothing causes his panic attacks except for going out in large crowds (R. at 79). He stated that he gets panic attacks three or four times a week and that they last for five or ten minutes (R. at 79). He alleges that he has had panic attacks for three or four years and that they last from about half an hour to forty minutes (R. at 60). Plaintiff states that he cannot work full time because he has panic attacks "all the time" or "two to three times a week" when he is around crowds (R. at 59). The ALJ's notes indicate Plaintiff was admitted to AtlantiCare on February 17, 2010 for his first panic attack (R. at 62).

Plaintiff indicated that he goes to AA meetings but not to the grocery store (R. at 79-80). Plaintiff has lost several jobs because he would "end up being so depress [*sic*] and just not showing up." (R. at 56). Plaintiff indicated that he interviewed for a job 2010 but did not start

9

the job because he could not get out of bed (R. at 64-5). He stated that later he realized that trying to work was not realistic (R. at 65-6). He stated that he came to this conclusion at the recommendation of his therapist but could not remember why she said he should not work (R. at 67).

Plaintiff stated that he has had "ups and downs" with his mood and panic attacks since 2009 (R. at 57). Plaintiff stated that he attempts suicide and ends up going back to drinking because he "gets so depressed" and then starts "thinking like I might as well start drinking again because I'm happier when I drink." (R. at 58). Plaintiff stated that has attended therapy and has treated with doctors at AtlantiCare since November of 2009. He also goes to half-day meetings at Providence House (R. at 58). Plaintiff alleges that he usually attends therapy and meetings at Providence House regularly (R. at 58-59).

Plaintiff stated that his last suicide attempt was due to hearing voices telling him to kill himself and being depressed (R. at 80). Plaintiff stated that he hears voices every day for ten to twenty minutes or an hour (R. at 80). He said that he cannot even watch TV during that time because he would not remember what he watched (R. at 81). He alleged that he was not on drugs or alcohol at that time but that the anniversary of his mother's death was a stressor (R. at 81). Plaintiff stated that he takes his medication regularly and that he is reminded by his father in the mornings (R. at 82-3). Plaintiff indicated that he was on his medication during his suicide attempts (R. at 84).

Plaintiff stated that the work he used to do was maintenance work and included painting laundry rooms and halls, picking up trash, mulching, and sheet rocking. At the April 10, 2012 hearing VE Louis Szollosy stated that Plaintiff would be able to perform his previous type of work (R. at 71-2). This hearing began late and ended prior to conclusion due to time constraints

(R. at 75). Testimony continued on August 17, 2012 with a different VE William Slaven (R. at 76). VE Slaven indicated that someone with Plaintiff's limitations would not be able to perform the DOT's written description of Plaintiff's previous job, but that Plaintiff would be able to perform his past relevant work (R. at 89). VE Slaven indicated that if someone was performing at half pace because of having hallucinations for up to one hour during the workday, that person would be fired (R. at 91).

*V. Standard of Review*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. See 42 U.S.C. § 405(g)(2012). This Court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id. "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richard v. Perales, 402 U.S. 389, 401 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. See id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. See 5 U.S.C. § 706(1)(F) (2012).

*VI. Discussion*

Under SSA, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ..." 42 U.S.C. §§ 416(i)(l); 423(d)(l)(A); 20 C.F.R. § 404.1505 (2012). A person is unable to engage in substantial activity when:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives,, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled under SSA, a five-step sequential evaluation process must be applied. See 20 C.F.R. § 404.1520; McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows: At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i). At step two, the Commissioner must determine whether the claimant has a severe impairment. See id. at § 404.1520(a)(4)(ii). If the Commissioner determines that the claimant has a severe impairment, he must then determine whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, subpart p, Appx. 1. §404.1520(a)(4)(iii). If the claimant does not have an impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent him from performing his past relevant work. See id. at § 404.1520(a)(4)(iv). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering his residual functional

capacity and age, education and work experience. See id. at § 404.1520(a)(4)(v); see also
McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262, 262-63 (3d Cir. 2000). If the ALJ
finds that the claimant is disabled using this five step evaluation process but there is medical
evidence of substance use disorders, the Commissioner must determine if the substance use
disorders are a contributing factor material to the disability determination. See 20 C.F.R.
404.1535, 416.935. If so, then the claimant is not disabled. In this case, the Commissioner
determined that claimant was disabled under the five-step process, but that his substance abuse
disorders were a material factor in this determination. Because the claimant's remaining
limitations would not be disabling if he stopped his substance abuse, he was determined
ineligible for benefits by the ALJ.

The Third Circuit subscribes to the "treating physician doctrine." Mason v. Shalala, 994,
F.2d 1058, 1067 (3d Cir. 1993). Under this doctrine, a treating physician's opinion is given
"controlling weight" if it is "well-supported by medically acceptable clinical and laboratory
diagnostic techniques and it is not inconsistent with the other substantial evidence in the record."
Fargnoli, 247 F.3d at 43. The ALJ "cannot disregard the opinion of a treating physician without
referencing objective medical evidence conflicting with the treating physician's opinion and
explaining the reasoning for rejecting the opinions of the treating physician." Dass v. Barnhart,
386 F.Supp.2d 568, 576 (D. Del. 2005).

Plaintiff bears the burden of proving that his RFC or limitations are that which do not
allow for any work in the national economy. See Heckler v. Campbell, 461 U.S. 458, 460
(1983); Matthews v. Eldridge, 424 U.S. 319, 336 (1976). Moreover, the ALJ is not required to
uncritically accept Plaintiff's complaints. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356,
363 (3d Cir. 2011). The ALJ, as fact finder, has the sole responsibility to weigh a claimant's

complaints about his symptoms against the record as a whole. See 20 C.F.R. §§ 404.1529(a), 416.929(a).

The vast majority of information in the record concerns Plaintiff's rehabilitation efforts from drug and alcohol addiction. A person may not obtain social security benefits if he is disabled due to drugs and alcohol addiction. A person may still obtain benefits if his remaining limitations, were he to stop using drugs and alcohol, qualified him as disabled. The record in this case does not support overturning the ALJ's determination that Plaintiff was not disabled without the limitations caused by his substance abuse disorders.

Plaintiff puts forth three basic arguments: (1) That the ALJ improperly disregarded the medical opinion of his treating physician; (2) that the ALJ improperly determined Plaintiff's RFC as he disregarded the opinion of the VE; and (3) that the ALJ and erred as a matter of law in finding that Plaintiff's substance use disorder was a contributing factor to his disability.

We agree with the ALJ that he did not improperly disregard the medical opinion of one of Plaintiff's treating physicians, Dr. Ashfaq. The ALJ actually agreed with Dr. Ashfaq that Plaintiff is disabled (R. at 29). However, the ALJ did not give Dr. Ashfaq's opinion great weight because Dr. Ashfaq did not address the effect of Plaintiff's substance abuse disorders on Plaintiff's limitations. When Dr. Ashfaq determined Plaintiff to be disabled and unable to work full time or part time from August 17, 2010 to August 16, 2011, he took Plaintiff's substance abuse disorders into consideration in making this determination (R. at 424). Under SSA, the disability determination must be made on the limitations remaining if the claimant were to stop using drugs and alcohol.

With regard to Plaintiff's RFC argument, we believe that the record supports the ALJ's determinations reflected in his evaluation. The ALJ considered Plaintiff to be an undertreated

14

patient who has been refractory to professionally managed mental health treatment not following treatment suggestions to abstain from substance use (R. at 40). This is supported by the repeated instances in the medical record where Plaintiff was discharged from treatment due to his noncompliance and lack of attendance to treatment sessions. In an attempt to gain control of Plaintiff's treatment he was required to start receiving his medication by injection due to his refusal to take his medication as directed (R. at 477, 516-519).

In determining Plaintiff's RFC, the ALJ concluded that Plaintiff's testimony minimized the effect of his substance abuse as related to his impaired ability to do physical and mental work. Throughout the record it is documented that during the times when Plaintiff was following his prescribed treatment plan, Plaintiff showed improvement in his ability to manage his depression and anxiety. On June 7, 2010, Plaintiff's therapist noted that Plaintiff's substance use could contribute to the presentation of Plaintiff's mental disorders (R. at 416). During March of 2010, when he was medication and treatment compliant, Plaintiff even interviewed for a job (R. at 476).

Plaintiff testified that he did not feel he would be able to work even during periods of sobriety because of his panic attacks. He testified that he has panic attacks "all the time" when he is in large crowds (R. at 59, 79). He stated that he has panic attacks two or three times a week when he is out and that they last for thirty to forty minutes (R. at 59-60). He later testified that he has panic attacks three or four times per week and that they last for five or ten minutes (R. at 79). In response to these assertions the ALJ stated that he thought Plaintiff's symptoms limiting his social interaction were not as severe as Plaintiff indicates (R. at 41). The ALJ supports this conclusion with the facts that Plaintiff maintains appropriate interaction with his mental health professionals and his group therapy sessions (R. at 40). While Plaintiff testified that his panic

attacks were several days per week and severe, mention of them in the medical record is not as frequent. Additionally, Plaintiff stated at one time he was able to manage them with coping mechanisms he had learned in therapy (R. at 607). Furthermore, as noted by the ALJ, Plaintiff claims that he gets panic attacks in large crowds of people and is unable to maintain normal social interaction but has successfully gone to and sought out group therapy and AA meetings. Plaintiff also testified that that he heard voices telling him to kill himself every day for ten minutes to an hour (R. at 80). The record, however, reflects that Plaintiff had very infrequent auditory and visual hallucinations and denied having them when undergoing treatment (R. at 335, 376, 411-413, 520). We believe the ALJ's conclusions are supported by the record.

VE Szollosy at the April 10, 2012 hearing testified that Plaintiff's limitations would not preclude the requirements of his previous work (R. at 72). VE Slaven at the August 17, 2010 also testified that while Plaintiff could not perform the job as written in the DOT, he would be able to perform his past relevant work (R. at 88-89). VE Slaven indicated that someone who experienced hallucinations for up to one hour during the workday who would be unable to work during that time would get fired (R. at 93). However, the record does not reflect that this hypothetical applies to Plaintiff.

Plaintiff's third argument is that ALJ and erred as a matter of law in finding that Plaintiff's substance use disorder was a contributing factor to his disability. Even if it disagrees with the findings of the ALJ, this Court may not substitute its own conclusions for that of the fact-finder. See Burns, 312 F.3d at 118; Fargnoli, 247 F.3d at 38. As a matter of law, the ALJ did not err if his conclusions were supported by substantial evidence from the record. While substantial evidence is made of more than a scintilla, it only requires "such relevant evidence as

a reasonable mind might accept as adequate." Ventura, 55 F.3d at 901 (quoting Richard v. Perales, 402 U.S. 389, 401 (1971)).

After reviewing the record as a whole, we find that the ALJ's conclusions were supported by substantial evidence from the record. Additionally, the ALJ gives detailed support for his opinion drawing from Plaintiff's medical records and testimony and the relevant case law (R. 29-42).

## *VII. Conclusion*

For the foregoing reasons, we conclude that the record contains substantial evidence supporting the determination that Plaintiff is not disabled within the meaning of the SSA. Plaintiff's Motion for Summary Judgment [ECF No. 8] is DENIED. Defendant's Motion for Summary Judgment [ECF No. 11] is GRANTED.

An appropriate order will be entered.

Date: August 17, 2015

Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc: counsel of record